**John J. EAKIN, d/b/a Cypress Helicopter Company, Plaintiff,**

v.

**UNITED TECHNOLOGY CORP., d/b/a Sikorsky Helicopter, Defendant.**

**No. 87–1723–CIV–HOEVELER.**

United States District Court,
S.D. Florida.

Jan. 8, 1998.

Ron A. Sprague, Gendry & Sprague, San Antonio, TX, for plaintiff.

Howard E. Barwick, Barwick, Dillian, Lambert & Ice, P.A., Miami, FL, for defendant.

Richard McAlpin, Mitchell, McAlpin, Brias & Associates, P.A., Miami, FL, for intervenor.

### ORDER ON PENDING MOTIONS AND DISMISSAL WITH PREJUDICE

HOEVELER, Senior District Judge.

THIS CAUSE comes before the Court upon the following motions: (1) Plaintiff John J. Eakin's ("Eakin") Motion for Partial Reconsideration of Order Determining Intervenor's Lien, filed July 8, 1997; (2) Attorneys Howard M. Acosta ("Acosta") and Myron P. Papadakis' ("Papadakis") Motion to Enforce Charging Lien,[1] filed June 24, 1997; and (3) Intervenor Insurance Company of North America's ("INA" or "Intervenor") Motion to

---

1. For simplicity, the Court will refer only to Acosta when discussing this Motion.

Tax Costs and for Entry of Final Judgment, filed June 24, 1997.

## I.

### GENERAL BACKGROUND

On February 13, 1984, Plaintiff John Eakin and former Plaintiff Thomas Turner were injured in a helicopter crash during a logging operation. Defendant, United Technology Corp. d/b/a Sikorsky Helicopter ("Sikorsky"), manufactured the helicopter involved in the accident in 1958.

On January 15, 1985, Eakin filed this action in the United States District Court for the Eastern District of Louisiana to recover damages for the injuries he suffered as a result of the February 1984 crash. On January 25, 1987, INA, Eakin's workers' compensation insurance carrier, filed a Complaint of Intervention seeking to recover workers' compensation benefits it had paid to Eakin as a result of the accident.

The case was transferred to the Southern District of Florida in 1987 and was finally scheduled to go to trial on February 24, 1997. Less than one week before trial, however, Eakin and Sikorsky informed the Court that they had settled their dispute. As represented to the court at that time, the settlement agreement called for Sikorsky to pay Eakin a lump sum of $600,000 in exchange for Eakin's dismissal of all claims against Sikorsky.

After the agreement was announced, INA voiced its objection and claimed it was entitled to a lien on the settlement proceeds under Louisiana law. Despite negotiation efforts between Eakin and INA to settle the amount of the Intervenor's lien, the two were unable to reach a compromise. As a result, Sikorsky refused to tender the $600,000 settlement figure until either this Court or both Eakin and INA agreed to hold it harmless for any outstanding lien claims. On March 12, 1997, Eakin moved the Court to determine if INA was entitled to a lien under Louisiana law, and if so, in what amount.

In an Order Determining Intervenor's Lien, dated May 30, 1997, this Court awarded INA a $226,197.68 workers' compensation insurance lien against any recovery by Eakin. The Court found that INA was entitled to the full amount requested because Eakin failed to obtain INA's authorization of the

settlement with Defendant as required under Louisiana law. The Court further determined that Eakin was not entitled to have INA assume a proportionate share of Eakin's attorney's fees and costs.

On June 24, 1997, Eakin's former counsel, Acosta and Papadakis, moved this Court to establish a charging lien for attorney's fees. Eakin's former counsel, who were working on a contingency basis, claimed that they were entitled to their contingency fee since they negotiated the settlement with Sikorsky on Eakin's behalf. Eakin refuses to pay the fee, arguing that his former attorneys are not entitled to a fee because the settlement proceeds have never been distributed.

Also on June 24, 1997, INA moved this Court to enter a final order and to tax costs for amounts expended by INA in connection with its experts' testimony.

Finally, on July 8, 1997, Eakin's new attorney, Ron A. Sprague, filed a Motion for Partial Reconsideration of the Order Determining Intervenor's Lien. The Motion asked the Court reconsider its earlier ruling denying Eakin the right to have INA assume a proportionate share of Eakin's attorney's fees.

The Court will first discuss Eakin's Motion for Partial Reconsideration, then Acosta's Motion to Enforce Charging Lien, and finally INA's Motion to Tax Costs and for Final Judgment.

## II.

### EAKIN'S MOTION FOR PARTIAL RECONSIDERATION

As stated *supra*, this Court awarded INA the full amount of the worker's compensation lien requested because Eakin failed to obtain the Intervenor's authorization before settling with Sikorsky. The Court also denied Eakin's request to have INA contribute a proportionate share towards Eakin's attorney's fees.

The gravamen of Eakin's Motion for Partial Reconsideration is that under Louisiana law, specifically, *Moody v. Arabie*, 498 So.2d 1081 (La.1986), an intervening workers' compensation insurer is required to share in an

employee's cost of prosecuting a claim against a third party tortfeasor, where the insurer benefits from the efforts of the worker's attorney. Eakin argues that he pursued a tort claim against Defendant Sikorsky that resulted in a settlement of $600,000; $226,-198 of which INA will receive as reimbursement for benefits it has paid to Eakin. Thus, Eakin claims, INA has benefitted from labor of Eakin's attorneys, and must, under Louisiana law, share in the costs of securing that benefit by assuming a proportionate share of Eakin's attorney's fees and costs.

***

As a federal district court sitting in a diversity action, this Court was, and is, charged with the duty of ascertaining and applying Louisiana's rather complex workers' compensation laws. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). To compound the usual problems associated with interpreting and applying a state's laws, the issue presented in this case—whether an employee is entitled to *Moody's* fees where he has entered into an unauthorized settlement—is a novel one that has yet to be addressed by any Louisiana court, let alone its highest court. But "no matter how difficult the task, [a Federal court] must ascertain (and then apply) what the state law is." *Crowe v. Coleman,* 113 F.3d 1536, 1540 (11th Cir.1997). So despite the lack of authoritative pronouncements by Louisiana's legislature or its courts, this Court set-out to determine how Louisiana's Supreme Court would rule on a request for *Moody's* fees where an employee entered into a settlement with a tortfeasor without first obtaining the approval of its worker's compensation carrier.

After reviewing the only case directly on point, *King v. Employers Nat. Ins. Co.,* 928 F.2d 1438 (5th Cir.1991), this Court adopted what appeared to then be a sound conclusion:

> Louisiana's workers' compensation legislative scheme which imposes penalties on the employee and tortfeasor for settling without the employer/insurer's consent is "incompatible with *Moody's* goal of requiring the employer (or carrier) to contribute to the employee's attorney's fees when he recovers from the tortfeasor."

Order Determining Intervenor's Lien, 20 (quoting *King,* 928 F.2d at 1444). This Court, however, was also aware of the Fifth Circuit's admonition in a subsequent case that:

> the task of predicting the final course to be taken by the supreme court of a state is a difficult one. The Erie guesses made under circumstances such as presented in this case[—a case involving the application of *Moody* —] are many times wrong. We have no assurance that the predictions we make today will ultimately fare better than the notable similar forays into diversity jurisdiction that have missed the mark.

*Labiche v. Legal Security Life Insurance Co.,* 31 F.3d 350, 354 (5th Cir.1994). Thus, when Eakin filed his Motion for Reconsideration, this Court was willing to take a critical look at its prior ruling.

Prompted by Eakin's Motion for Reconsideration, this Court reexamined the relationship between *Moody* and Louisiana's workers' compensation laws. The additional research and analysis revealed a well-developed body of Louisiana case law articulating a strong policy of having an intervening insurer assume a proportionate share of an employee's attorney's fees. While *King* remains the only case directly on point, (*i.e.,* it is the only case dealing with a request for attorney's fees where there had been an unauthorized settlement), this Court respectfully notes that the *King* court did not discuss any of these cases or policies. Instead, it analyzed one section of Louisiana's workers' compensation law and reached its conclusion.

Upon closer examination of Louisiana's statutes and cases, this Court finds that there are two distinct policies at play here: (1) protecting an intervening workers' compensation carrier under Louisiana's workers' compensation laws, and (2) reimbursing an injured worker a share of his attorney's fees under *Moody.* More importantly though, the Court finds that these two policies are not incompatible; there is a "false conflict" at best. In fact, the Court finds that Louisiana's workers' compensation scheme works in such a way as to make it practically impossible for these two policies to undermine one another.

■ Louisiana's workers compensation scheme essentially guarantees that an em-

ployer or insurer will not be prejudiced by the unilateral acts of an employee. Where there has been an unauthorized settlement by an employee and a tortfeasor, Louisiana's law "caps" or "freezes" the insurer's liability by: (1) relieving it of any obligation to pay future benefits, and (2) preserving the intervenor's cause of action for past payments against both the injured worker *and* the settling tortfeasor. *See* La.R.S. 23:1102(B), (C). Thus, when an employee enters into an unauthorized settlement with a tortfeasor, Louisiana's worker's compensation scheme is designed to achieve a specific, limited purpose: it is designed to cap the insurer's liability by limiting its future liability, and ensuring reimbursement for past expenditures from either the worker or tortfeasor.[2]

■ The Louisiana Supreme Court's decision in *Moody v. Arabie*, 498 So.2d 1081 (La.1986), is based upon an entirely different set of policies. In *Moody*, the Louisiana Supreme Court held that an employer or insurer are co-owners along with the employee of any rights the employee may have against a third party. *Id.* at 1085. The *Moody* Court stated that *the laws and policies that govern property and partnerships* apply when determining whether an insurer should assume a proportionate share of the employee's attorney's fees. *Id.* at 1085 (emphasis added). Most telling, however, are the *Moody* court's statements that

Acts by a sole co-owner, *if useful to all,* are ratified as a defacto agency (*negotiorum gestio* ). Each co-owner may force the others to contribute to the costs of maintenance and conservation of the common thing in proportion to their interests. . . .

. . . [E]ach co-owner is liable for necessary maintenance and conservation costs, such as those involved in filing suit . . ., *regardless of whether he consented to them* . . . . Moreover, whenever the worker or the employer intervenes in such an action, he tacitly consents to a material change in the right and *ratifies all reasonable necessary*

*acts which are useful and beneficial to his interest.*

*Id.* at 1085–86 (emphasis added).

The Fifth Circuit, despite the *King* opinion, has recognized that the unique policy and rationale of *Moody* exists independent of Louisiana's workers' compensation laws:

The *Moody* court intended to prevent an intervenor insurance company from "free riding" on the plaintiffs' attorney by not paying any portion of the attorneys' fees. *Moody* appears to be based *not upon any special principles of workers' compensation law, but on principles applicable to partial subrogation generally.*

*Labiche,* 31 F.3d at 354 (emphasis added).

The fact that Louisiana's workers' compensation scheme is a product of the State's legislature, whereas *Moody* is judicially crafted, is irrelevant. The vitality and importance of *Moody*'s fee sharing policy cannot be overstated. As Louisiana's Supreme Court noted, "*Moody* was subsequently codified at La.R.S. 23:1103." *Barreca v. Cobb,* 668 So.2d 1129, 1131 n. 4 (La.1996). Moreover, the *Moody* apportionment of fees has been embraced by Louisiana courts in divergent factual settings. *See, e.g., Norris v. Goeders,* 652 So.2d 144 (La.App. 2nd Cir. 1995) (awarding *Moody* fees even though injured worker failed to provide timely notice to workers' compensation carrier); *Broussard v. Lewis,* 614 So.2d 260, 262 (La.App. 3rd Cir.1993) (requiring intervenor to assume proportionate share of worker's attorney's fees even though worker "consistently denied" insurer's right to intervene, insurer and worker were adverse, and neither were working towards joint benefit); *Thompson v. Gray & Co.,* 590 So.2d 1318 (La.App. 1st Cir.1991) (awarding *Moody* fees where injured employee did not even file suit; he simply executed a settlement agreement); *Broussard v. Olin Corp.,* 546 So.2d 1301, 1308 (La.App. 3rd Cir.1989) (requiring intervening insurer to assume proportionate share of worker's attorney's fees even though

---

**2.** As the facts of this case illustrate, Louisiana's worker's compensation scheme is effective in achieving its modest goal. Here, Sikorsky, the tortfeasor, is refusing to consummate the settlement agreement with Eakin without INA's approval because it will remain liable to INA under Louisiana law.

worker's suit against third-party failed to produce a recovery).

Additionally, the Louisiana Supreme Court has demonstrated a willingness to expand, not contract, *Moody* by extending its application beyond the realm of workers' compensation. *See Barreca*, 668 So.2d at 1131–32 (requiring health insurer to assume a proportionate share of insured's attorney's fees).

The *only* instance in which the Louisiana Supreme Court has refused to order the apportionment of attorney's fees is where the insurer insured both the plaintiff (as a workers' compensation carrier) and the tortfeasor (as a general liability insurer). *See Hebert v. Jeffrey*, 671 So.2d 904 (La.1996). And the reluctance to extend *Moody* under such circumstances is perfectly understandable. Where an insurer insures both the plaintiff and defendant, the insurer cannot benefit by the employee-plaintiff's recovery since it, the insurer, is the one paying the plaintiff. To have an insurer assume a proportionate share of the plaintiff's attorneys fees under such facts would elevate form over substance and would make little sense.

■ Turning to the instant case, INA was able to, and did, invoke the full protection afforded to intervening insurers under Louisiana's workers' compensation laws. After finding Eakin's failure to obtain INA's approval violated Louisiana's worker's compensation laws, this Court awarded INA the entire amount of its requested lien over Eakin's adamant objections (a point Eakin no longer contests). Additionally, this Court disregarded the allocation of the settlement proceeds advanced by Eakin and Sikorsky ($500,000 allocated towards pain and suffering). Ordinarily, such an allocation would have limited INA's lien to $100,000 under Louisiana law. *See, e.g., Johnson v. Star Enterprises*, 704 So.2d 857, 858–59 (La.App. 5th Cir.1997) (intervenor not entitled to recover from employee's pain and suffering award). However, because INA did not authorize the settlement, the Court was compelled to disregard such a prejudicial allocation.[3]

In short, INA can no longer be prejudiced here as it has no future liability and it has been, or will be, fully reimbursed for the past benefits it paid. Thus, Louisiana's workers' compensation laws have served their limited purpose.

Turning to *Moody*, there is little doubt that Eakin's actions were useful to and benefitted INA. Eakin's attorneys created the pool from which INA is to be reimbursed. As a result, *Moody* and its progeny require that INA assume a proportionate share of Eakin's attorney's fees. To deny Eakin the right to have INA share in his attorney's fees would be to impose an additional penalty on Eakin; one that is not contemplated by Louisiana's worker's compensation statutes. More importantly though, giving INA a free ride would undermine *Moody*'s goals without advancing any of the policies captured in Louisiana's workers' compensation laws. Accordingly, the Court reverses its earlier decision and finds that Eakin is entitled to have INA assume a proportionate share of Eakin's attorney's fees.

Having decided that INA is liable for a share of Eakin's attorney's fees, the Court must calculate what that share is in accordance with the formula announced by the Louisiana Supreme Court in *Moody*. However, because that calculation requires, *inter alia*, a determination of Eakin's total attorney's fees, the Court must postpone the calculation until a determination is made as to how much, if anything, Eakin's former attorneys, Acosta and Papadakis, are entitled to.

### III.

### *ATTORNEYS ACOSTA AND PAPADAKIS' MOTION TO ENFORCE CHARGING LIEN*

On November 11, 1996, Eakin and Acosta executed a standard contingency fee contract. The contract specified that Acosta would represent Eakin in his claim against Defendant in exchange for 30% of "any recovery" realized by Eakin.

---

**3.** Moreover, the amount of doctor bills and other special damages belie the validity of such an allocation.

Nothing in the record indicates the existence of any tension between Acosta and Eakin until it became apparent that INA was entitled to a substantial lien. At that point, both Eakin and Acosta agree the relationship between the two began to deteriorate. On June 13, 1997, after some harsh exchanges between Acosta and Eakin, including, *inter alia,* allegations of malpractice and intent to commit insurance fraud, Acosta formally withdrew from his representation of Eakin.[4] On June 24, 1997, Acosta filed his Motion to Enforce Charging Lien on the $600,000 settlement proceeds for the contingency fee Acosta claims to have earned. At that point in time Sikorsky refused to distribute the $600,000 because it had not obtained the assurance it wanted (*i.e.,* to be held harmless from any outstanding liens and claims).

Acosta's claim is straightforward. Acosta argues that because he negotiated a $600,000 settlement on Eakin's behalf, he is entitled to 30% of the $600,000 under the terms of the contingency fee contract. Eakin, however, takes exception to Acosta's claim on several alternative grounds. Eakin challenges the validity of the contingency fee contract itself, arguing that it violates several Florida Bar Rules and is thus unenforceable. Eakin then points out that even if the contract is enforceable, he, Eakin, has not yet recovered anything as the settlement agreement has not been finalized. Thus, Eakin argues, Acosta withdrew from representation without consent or justification prior to the occurrence of the contingency (*i.e.,* a recovery by Eakin). As a result, Eakin claims Acosta forfeited any attorney's fees he may have been entitled to under the contract. Alternatively, Eakin asserts that if Acosta's withdrawal was justified, he is only entitled to a fee based on a theory of *quantum meruit*

because he withdrew before the contingency had occurred.

Eakin also asserts that if Acosta is entitled to a percentage of Eakin's recovery under the contract, he is only entitled to a percentage of Eakin's net, not gross, recovery.[5] Moreover, Eakin states that if Acosta is entitled to a percentage of Eakin's net recovery, the determination of Acosta's fee is not ripe for judicial review since the net amount of Eakin's recovery has not yet been determined. Finally, Eakin claims that an award of attorney's fees to Acosta under any theory in excess of 50% of Plaintiff's net recovery is excessive.

### A. *THE CONTINGENCY FEE CONTRACT IS VALID*

Eakin argues that the contingency fee contract is unenforceable under Florida law because it violates the Rules Regulating the Florida Bar in two respects. First, Eakin claims that the contract is unenforceable under Rule 4–1.5 because the fee Acosta is claiming under the contract, (30% of $600,-000=$180,000), is excessive. Second, Eakin claims the contract violates Rule 4–1.5(f)(4)(D) because Acosta and Papadakis are splitting their fees 70/30, respectively, and Acosta was responsible for performing all of the legal work.

■ The Court will address Eakin's excessive fee claim in Part III. D. With respect to the fee sharing arrangement, the Court finds the Preamble to Chapter 4 of the Rules Regulating the Florida Bar explicitly denounces Eakin's efforts to use a Rule as a sword in this civil action.

The Preamble is unmistakably clear:

**4.** The Court notes that Eakin has accused Acosta of malpractice, and relies on those accusations to avoid paying Acosta's claimed fee. However, as the Eleventh Circuit has expressly held, any malpractice claim a client may have against an attorney is not relevant for purposes of determining whether the attorney is entitled to his or her contractual fee. *See Zaklama v. Mount Sinai Medical Center,* 906 F.2d 650, 653 (11th Cir. 1990) (refusing to consider client's claims of malpractice when reviewing lower court's decision to award attorneys their fees under contingency fee contract). Accordingly, the Court will not consider any claims of malpractice when decid-

ing whether Acosta is entitled to a fee under the contingency contract.

**5.** Ordinarily, the term "net recovery" in contingency fee cases refers to gross recovery less litigation costs. Here, however, in addition to the costs, Eakin claims that any liens he has to pay out of the settlement proceeds should also be deducted from the gross recovery to arrive at, what Eakin is referring to as, the net recovery. The Court adopts Eakin's definition of net recovery for purposes of discussing the merits of tire claims.

Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. *They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons.* The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, *does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule.* Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such duty.

Fla. Bar R., Pmbl.

The case law on the issue is equally clear. In *Tew v. Arky, Freed, Stearns, Watson, Greer, Weaver & Harris, P.A., et. al.,* 655 F.Supp. 1571 (S.D.Fla.1987), *aff'd.,* 846 F.2d 753 (11th Cir.1988), the court noted that the Florida Supreme Court plainly stated its views when it drafted the preamble, and cited "[n]umerous cases [which held] that the Disciplinary Rules do not create a private cause of action." *Id.* at 1573 (citations omitted); *see also Smith v. Bateman Graham, P.A.,* 680 So.2d 497, 498 (Fla. 1st DCA 1996) (citing Preamble and noting the ethics rules themselves preclude a private cause of action arising from a violation of the rules) (citations omitted). Accordingly, the Court finds that Eakin has no basis for invoking the Rules Regulating the Florida Bar as a means to void an otherwise valid contract.

Having determined the contingency fee contract is valid and enforceable, the issue that must now be decided is whether Acosta withdrew before obtaining the contingency; whether Acosta withdrew before Eakin obtained a recovery. If Acosta obtained the contingency, he will be entitled to his contingency fee under the contract. *See Zaklama v. Mount Sinai Medical Center,* 906 F.2d 650, 653 (11th Cir.1990) ("[An] attorney, who has obtained the contracted contingency, is entitled to his stated fees under the contin-

gency fee contract and not quantum meruit.") (citing *Milton Kelner, P.A. v. 610 Lincoln Road, Inc.,* 328 So.2d 193, 194, 196 (Fla. 1976)). If, however, Acosta withdrew before Eakin realized a recovery, then this court must determine whether such withdrawal was justified.

If withdrawal prior to the occurrence of a contingency was justified, Acosta will be entitled to attorney's fees under either the contract or a *quantum meruit* theory, depending on the justification. *See, e.g., Faro v. Romani,* 641 So.2d 69, 71 (Fla.1994). If, however, Acosta withdrew prior to the occurrence of the contingency without consent or justification, he will not be entitled to attorney's fees under any theory of compensation, *Id.*

## B. *ACOSTA IS ENTITLED TO A CONTINGENCY FEE UNDER THE CONTRACT*

■ Both parties agree that Acosta withdrew from representation on June 13, 1997. The first question, then, is whether Eakin obtained a recovery from Defendant prior to that date.

Neither Eakin nor Acosta dispute that a settlement agreement between Eakin and Defendant would constitute a "recovery" within the meaning of the contingency fee contract provision that called for the payment of attorney's fees if "any recovery" was obtained. Eakin and Acosta disagree, however, on whether Eakin and Defendant agreed to a settlement prior to June 13, 1997.

Acosta asserts that a settlement agreement had in fact been reached prior to his withdrawal on June 13, 1997. In support of his position, Acosta emphasizes that Eakin filed a Notice of Settlement dated February 17, 1997, and acknowledged the settlement at the evidentiary hearing regarding the determination of the Intervenor's lien on March 5, 1997. Moreover, Acosta points out that in an Affidavit dated March 13, 1997, Eakin acknowledged the $600,000 settlement. Finally, Acosta notes that Eakin has tried to avail himself to some of the proceeds of the settlement agreement by requesting that Defendant tender such amount that would not be subject to the Intervenor's lien.

Eakin counters by claiming that, because he has not received any money from Defendant, he has not obtained a recovery to date, let alone as of June 13, 1997. Eakin characterizes Acosta's efforts as negotiating an acceptable settlement amount to be obtained from Sikorsky, but an ultimate recovery by Plaintiff has not been had since it is conditioned upon resolution of the lien with INA.

The Court finds that Eakin is advancing the very same argument previously rejected by this Court in its Order Determining Intervenor's Lien. Eakin is again claiming that the parties have not executed a binding settlement agreement because Defendant is not obligated or is refusing to consummate the agreement until either this Court, or both Eakin and INA release it from all liability. Having found a settlement had been reached for purposes of triggering the penalty provision of Louisiana's workers' compensation laws, this Court is compelled to find a settlement has also been reached for purposes of the contingency fee contract.

In the Order Determining Intervenor's Lien, the Court looked to Louisiana's statutory definition of a "compromise" to ascertain whether the "understanding" reached by Eakin and Sikorsky constituted a settlement agreement.[6] This Court noted that Louisiana Civil Code, Article 3071 defines compromise as: "an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent...." *Id.* The statute also states that a compromise must be "either reduced into writing or recited in open court and capable of being transcribed from the record of the proceeding. [An] agreement recited in open-court confers upon each [party] the right of judicially enforcing its performance, although its substance may thereafter be written in more convenient form." *Id.*

As stated in the Order Determining Intervenor's Lien, the following undisputed facts lead this Court to conclude that Eakin and Sikorsky reached a settlement or compromise prior to June 13, 1997:

1) On February 17, 1997, Eakin's then-counsel, Acosta, sent a letter to Rick Polesak, the case manager at Associated Aviation Underwriters (Defendant's insurance carrier), confirming a conversation they had on February 16, 1997, regarding the agreement to settle the law suit for the sum of $600,000.

2) On February 18, 1997, Eakin filed a Notice of Settlement with this Court stating that the "claims against Defendant ... have been amicably settled and, therefore, trial of this action shall not be needed."

3) On February 20, 1997, during a telephone status conference, counsel for both Eakin and Defendant represented to this Court that a settlement had been reached.

4) On March 5, 1997, during an evidentiary hearing, Eakin and both his counsel and Defendant's counsel represented to this Court that all claims between the two parties have been amicably settled.

5) Eakin has asked Sikorsky to tender $250,000 of the $600,000.

6) On May 27, 1997, Defendant's counsel sent Eakin's then-counsel, Acosta, a General Release and a Stipulation for Order of Dismissal ("General Release") to be signed, along with a letter indicating that $250,000 of the $600,000 will be disbursed to Eakin upon receipt of the executed General Release. The remaining $350,000 was to be withheld pending a final resolution of Intervenor's lien.

The above communications, in the aggregate, support a finding that Eakin and Defendant, by mutual consent, agreed to put an end to their law suit. The letter from Eakin's then-attorney Acosta to Defendant, and the General Release constitute writings which contain the material terms of the settlement. The oral representations made openly in this Court that a settlement had been reached whereby Defendant agreed to pay Eakin $600,000 for the release of all claims entitles either party to judicial enforcement of the agreement or compromise.

---

**6.** A compromise is equivalent to a settlement for purposes of the statute. *See Townsend v. Square,* 643 So.2d 787 (La.App. 4th Cir.1994).

This is not to say that the parties have employed the most desirable means of memorializing their settlement negotiations. It is indisputable that a formally executed written document summarizing all pertinent terms and conditions, such as the General Release form sent to Eakin's counsel by Defendant's counsel, is the preferable means of displaying the fruits of long and arduous negotiations. However, it is just as certain that a formal, written document is not a necessary condition for a binding settlement agreement. *See, e.g., Lavan v. Nowell,* 676 So.2d 1192 (La.App. 3rd Cir.1996) (finding valid settlement agreement where parties represented in open court that settlement had been reached for $8,000, and plaintiff's attorney summarized the understanding in a letter to defendant's insurance carrier).

What this boils down to in the end are basic principles of contract law. Was there an offer and acceptance supported by consideration? Just who was the offeror and who the offeree is unclear from the record and is not important. What matters for purposes of the instant Motion is that a contract was formed at some point in time as evidenced by both parties repeated representations to this Court that they had agreed to settle their dispute; that Defendant would pay $600,-000—$500,000 of which would be allocated towards pain and suffering—in exchange for Eakin's promise to release defendant.[7]

As of today, neither Eakin nor Defendant have repudiated their agreement in court or elsewhere. In fact, subsequent to Acosta's withdrawal, Eakin's actions have been inconsistent with his current position that he has not reached a settlement with Defendant. Since Acosta withdrew, Eakin and his new

counsel filed a Motion for Partial Reconsideration questioning the Court's finding that INA was not required to assume a proportionate share of Eakin's attorney's fees. Implicit in Eakin's Motion was an acceptance that a settlement had been reached, otherwise Eakin would not be justified in asking for attorney's fees from INA. Eakin has also, as Acosta points out, tried to avail himself of a significant portion of the $600,000 by requesting that Defendant release such amount that would not be subject to Intervenor's lien. *See* Reply of Acosta and Papadakis to Plaintiff's Motion to Strike Charging lien, Ex. F. Moreover, in an Affidavit dated July 11, 1997 and filed in support of his Motion on this very issue, Eakin himself stated that he "agreed to settle the claims made the basis of this suit with Defendant … for a total of $600,000." Plaintiff's Motion to Strike Charging Lien, Ex. P–1, at 1; *see also id.* at 2 ("Subsequent to my agreement to settle with [Defendant] …."). Finally, referring to the settlement funds, Eakin, with his new attorney, stated "[t]hat settlement has been previously announced and parties expect it to be concluded as soon as the few remaining details can be worked out." Plaintiff's Response to Intervenor's Motion to Tax Costs and for Final Judgment, 2.

In short, no one has seriously called into question the fact that prior to June 13, 1997 Defendant agreed to pay, and Eakin agreed to accept, $600,000 in consideration of Eakin releasing all claims he has against Defendant. The only issue that arguably existed at the time Acosta withdrew on June 13, 1997, and the only issue that remains today, was, and is, how should the $600,000 be

---

7. Eakin's argument that an agreement has not been reached because Defendant is refusing to "close" unless he obtains a dismissal from this Court or a release from both Eakin and INA speaks, not to the existence of a valid contract, but rather to the term of the contract. What the exact terms of the agreement may be is not before this Court. For now, for purposes of determining whether a settlement had been reached which would have entitled Eakin to a recovery prior to June 13, 1997, this Court finds, as it did in its Order Determining Intervenor's Lien, that Eakin and Defendant have agreed to settle their dispute.

To be sure, had Defendant communicated to this Court that settlement was conditioned upon

it obtaining a release from this Court or from both parties, there would be a serious question of whether a meeting of the minds had ever taken place; whether a valid contract was formed. However, the Court emphasizes that Defendant never conditioned or qualified its representations. Defendant never stated that a settlement was contingent upon any event. It appears that the first time Defendant attached any conditions to the settlement was in a letter addressed to Eakin's counsel dated March 10, 1997, five days after representing to this Court without qualification that a settlement agreement had been reached, and after it became apparent that Eakin and Defendant settled without the Intervenor's

distributed among Eakin, Eakin's various attorneys, and the Intervenor—not whether Defendant will pay the $600,000. Neither Sikorsky nor Eakin has asked for a new trial date or indicated to this Court in any way that they have a live dispute as to settlement. The interested parties are simply waiting for the distribution of the $600,000—the figure negotiated by Acosta on Eakin's behalf. If Acosta did not secure for Eakin the right to receive the $600,000 from Defendant, then where does the $600,000 figure Eakin constantly refers to in his briefs come from?

Having represented Eakin in the negotiations which created the $600,000 pot to be distributed, Acosta is entitled to his contingency fee under the contract.

## C. ACOSTA IS ENTITLED TO A PERCENTAGE OF EAKIN'S GROSS OR TOTAL RECOVERY LESS LITIGATION COSTS

Acosta argues in his brief that he is entitled to have the contingency rate of 30% applied to Eakin's gross or total recovery of $600,000, for a fee of $180,000. Eakin, on the other hand, argues that the contingency fee, if payable, is to be calculated as a percentage of his net recovery, defining "net recovery" as gross recovery less legal expenses *and* liens to be paid out from the recovery.[8] The Court will segregate and discuss the calculation in two sub-parts: (1) whether the liens

are to be deducted from the gross recovery before calculating Acosta's contingency fee; and (2) whether litigation costs are to be deducted from the gross recovery before calculating Acosta's fee.

### 1. Acosta's contingency fee is to be calculated without regard to any liens

■ The analysis begins, as it must, with the plain language of the contract. The contract reads:

> As compensation for the services rendered and to be rendered, I agree to pay my said attorney, from the proceeds of recovery and any disputed insurance benefits, the following fee:

> (a) 30% of any recovery to be divided in the following manner: HOWARD M. ACOSTA is to receive 20% and MYRON P. PAPADAKIS is to receive 10%.

The parties disagree over the meaning of "any recovery." Acosta claims " 'any recovery' are the same words used by the Rules Regulating the Florida Bar to identify contingency fees. Any recovery means what it says." [9] Acosta's Reply to Plaintiff's Motion to Strike Charging Lien, 8. Eakin argues that the term "recovery" is not a term of art and should be given its normal meaning. After explaining that Webster's Dictionary

---

authorization, thereby exposing Defendant to continued liability.

**8.** According to Eakin, Acosta's contingency fee should be calculated as follows:

| | | |
|---|---|---|
| Gross Recovery | | $ 600,000.00 |
| Less: | | |
| Intervenor's lein | $226,197.68 | |
| Speiser Krause lien | 35,000.00 | |
| Acosta's expenses | 2,539.57 | |
| Papadakis' expenses | 964.00 | |
| Eakin's expenses | 104,073.30 | |
| | | |
| Total deductions | | (368,774.55) |
| Eakin's net recovery | | 231,225.45 |
| 30% contingency rate | | × .30 |
| Acosta's fee | | $ 69,367.63 |

**9.** Acosta also argues that "the addendum to the attorneys' fee contract signed by Mr. Papadakis states his fee was based upon 'gross recovery.' " Acosta's Reply to Plaintiff's Motion to Strike Charging Lien, 10. The addendum, however, was signed only by Papadakis, and was dated over a month after Eakin signed the contingency fee contract. *See* Acosta's Memorandum in Support of Charging Lien, Ex. A. Thus, there is no indication that Eakin ever saw the addendum, let alone agreed to it. Accordingly, the Court will not consider the addendum, which essentially clarifies the arrangement between Acosta and Papadakis, in determining whether Eakin agreed to pay the attorney's fees out of his gross or net recovery.

defines recovery as "to gain by legal process," Eakin asserts that all he has gained by legal process is the net amount since the other amounts do not go to him. Finally, Eakin argues that recovery is an ambiguous term, and should thus be construed against the drafter, Acosta.

The Court does not find either parties' textual or interpretive arguments persuasive. The words of the contract do not shed any light on how the fee is to be calculated. Acosta's reference to the Rules Regulating the Florida Bar is simply useless. While the Rules use the term any recovery, they do not define it. Moreover, the Rules do not mention, let alone discuss, what effect, if any, the presence a lien may have on the calculation of attorney's fees. Eakin's reference to Webster's dictionary is similarly unavailing.

In the interest of candor, the Court notes there are cases, not cited by either party, which support, at least implicitly, each parties' respective position. For example, in *Norris v. Goeders*, 652 So.2d 144, 147 (La. App. 2nd Cir.1995), a case cited and heavily relied upon by Eakin for a different purpose, the Court applied the contingency rate to the gross recovery where the contingency fee contract provided for "forty percent ·of the total recovery." *Id.* Without discussion, the *Norris* court applied the 40% contingency rate to the total $237,500 settlement amount in determining that plaintiff's attorney's fees totaled $95,000, despite the fact that the intervening insurance carrier was entitled to a $22,171.98 lien. *Id.* at 146.

Similarly, in *Davis v. Commercial Union Insurance Co.*, 892 F.2d 378 (5th Cir.1990), the Fifth Circuit, also without explanation, applied the contingency rate to the gross recovery where the contract provided for the calculation of the fee as "forty percent of all sums awarded." *Id.* at 385. In *Davis*, the Fifth Circuit determined that plaintiff's attorney's fees were 40% of the $17,862.50 recovered by plaintiff ($7,145), even though the intervening insurance carrier was entitled to a $2,938.97 lien. *Id.* at 385 nn. 7–8.

However, in both *Wood v. State Farm Mutual Automobile Ins. Co.*, 591 So.2d 1266, 1271 (La.App. 3rd Cir.1991), and *Denton v. Cormier*, 556 So.2d 931, 937 (La.App. 3rd Cir.1990), Louisiana's appellate court deducted the intervenor's lien from the employee's recovery before computing the attorney's contingency fee. In each of those cases, however, the respective courts did not refer to the terms of the contract.

Regardless of the paucity of guidance, this Court finds that a calculation of Acosta's Fees as a percentage of Eakin's recovery without any allowance for liens is supported, if not required, in light of the clear policy, under both Florida and Louisiana law, of holding an intervening insurance company liable for a proportionate share of an employee's attorney's fees. Underlying such a policy is the idea and the hope that an employee's attorney is vigorously prosecuting a claim against a third-party tortfeasor on behalf of both the employee and the intervenor. If the attorney's compensation is based exclusively on the employee's net recovery, there is certainly less incentive for the attorney to protect the intervenor's interests. The Louisiana Supreme Court based its holding in an analogous situation on the same rationale. *See Taylor v. Production Services, Inc.*, 600 So.2d 63, 67 (La.1992).

*Taylor* involved a claim for *Moody* fees. As is the case here, the contract between the employee and his attorney in *Taylor* was silent as to the computation of the contingency fee. The issue before the *Taylor* court, though, was what amount of attorney's fees should the intervenor assume (not what amount was the attorney entitled to from the employee). In holding that the fee should be calculated as a percentage of the employee's total recovery, the *Taylor* court noted that:

[a]llowance of a reasonable fee based on total recovery, to be shared by the parties in proportion to their interest in the recovery, provides an incentive to the plaintiff's attorney to vigorously pursue the third-party claim for the benefit of both parties concerned. Limiting the amount of attorney's fees on which the intervenor's proportionate share is based to a percentage of the net amount recovered by plaintiff distorts the intervenor's obligation and might preclude representation where the plaintiff's claim is marginal in value or in chances of recovery, but where plaintiff and his attorney are expected to and do in

fact take the lead and the risks in prosecuting the claim.

*Id.* Thus, this Court finds that having Acosta's fee computed on the basis of Eakin's total recovery, without any allowances for liens, is the most reasonable result.

### 2. Litigation expenses are to be deducted from Eakin's gross recovery before calculating Acosta's fee

While the Court has determined that Acosta's fee should be calculated as a percentage of Eakin's gross recovery without an allowance for liens, the Court does not reach the same result with respect to the litigation costs.

Acosta curiously invokes the Statement of Client Rights (the "Statement"), which was given to and signed by Eakin, to support his position that the fee was to be paid from gross recovery. The Statement, however, undermines Acosta's position. Paragraph six of the statement discusses the client's rights with respect to expenditures made by an attorney on the client's behalf. Paragraph six concludes with: "Your lawyer should also inform you whether the fee will be based on the gross amount recovered or on the amount recovered minus the costs." Thus, the Statement clearly imposed a duty on Acosta to specify how the fee was to be calculated with respect to costs. Having failed to do so, Acosta cannot now claim the more favorable method of calculating his fees.[10] Accordingly, costs must be deducted before calculating Acosta's fees.

### 3. Calculation of Acosta's contingency fee

In accordance with the discussion above, the Court calculates Acosta's fee as follows:

| | | |
|---|---|---|
| Eakin's gross Recovery: | | $600,000.00 |
| Less: | | |
| Acosta's expenses | $2,539.57 | |
| Papadakis' expenses | 964.00 | |
| Total expenses | | (3,503.57) |
| Eakin's gross recovery less expenses | | 596,496.43 |
| 30% contingency rate | | × .30 |
| **Acosta's contingency fee** | | **$178,9483.93** |

---

10. This, of course, is not to insinuate that Eakin is not liable for Acosta's and Papadakis' expenses. The Court is only saying here that the

Eakin claims an additional $104,073.30 in expenses that he would like deducted from the gross recovery before computing Acosta's contingency fee. On the record before the Court, this claim does not merit serious consideration. To begin with, Eakin provides absolutely no support or any reference to support for such an amount. Only after this Court, *sua sponte,* reviewed the Outline of Points in Opposition to INA's Workers' Compensation Lien, did the Court have any idea as to what the $104,073 represented. And when the Outline of Points was reviewed, it became patently obvious that Eakin's claim of $104,073 in expenses is meritless.

In the Outline of Points, the $104,073 is broken down as follows:

| | |
|---|---|
| Acosta's expenses (at that time) | $ 1,714.49 |
| Papadakis's expenses | 964.00 |
| Eakin's personal expenses | 18,145.91 |
| Costs/fees to Mendelson | 6,389.05 |
| Costs/fees to Speiser, Krause | 28,333.00 |
| Costs/fees to Cecile Hatfield | 13,526.85 |
| Actual amount paid to Speiser, Krause | 35,000.00 |
| Total costs | $104,073.30 |

First, Eakin simply lists $18,145.91 as personal out-of-pocket-expenses without providing the slightest indication as to what the amount covers. If these costs relate to Eakin having to litigate the case in this Court, Eakin does not provide any authority for his attempt to "tax" such costs.

Second, Eakin includes Acosta's and Papadakis' expenses as part of the $104,000 but he also attempts to deduct those very same expenses from the settlement proceeds as separate line items. *See supra,* note 7. If Acosta's and Papadakis' expenses are being deducted from the $600,000 settlement, they should not be included in the $104,000 Eakin is also trying to deduct from the $600,000. In short, Eakin is trying to get double milage out of Acosta's and Papadakis expenses, which, if permitted, would result in an unfair reduction of attorney's fees.

Finally, Eakin lists three lines of "costs/fees" relating to three different law firms. Eakin does not indicate whether these firms have ever been paid or whether they even

---

expenses are to be deducted from the recovery before calculating the attorneys' fees.

seek to be paid. With the exception of Speiser, Krause, the firms never indicated to this Court that they were entitled to any portion of Eakin's recovery. And with respect to Speiser, Krause, Eakin states that he and the firm agreed to reduce $121,131.04 of costs/fees to $35,000. Thus, the Court does not understand why Eakin lists $28,333 of "Costs/fees to Speiser, Krause" in addition to the $35,000 the parties settled on.

Because the $104,000 is either unsubstantiated or duplicative, and because Eakin has failed to demonstrate that any such costs are taxable under the law, the Court will not factor the claimed expenses into Acosta's fee calculation; these are matters which Plaintiff can take out of his agreed recovery.

### D. *ACOSTA'S FEE IS NOT EXCESSIVE*

Prepared for the worst, Eakin argues that any award of attorney's fees under the contract will be excessive, and any recovery by Acosta representing a significant majority of Eakin's "net recovery" is unconscionable. Acosta claims that the fee is not excessive.

Interestingly, the Court has not been able to find a case in which a trial court has declared a contingency fee, based on a valid contract, to be excessive. To the contrary, the courts uniformly declare that once the contingency (the recovery) has been obtained, the attorney is entitled to the contingency fee under the terms of the contingency contract. *See, e.g., Zaklama v. Mount Sinai Medical Center,* 906 F.2d 650, 653 (11th Cir. 1990) ("[An] attorney. who has obtained the contracted contingency, is entitled to his stated fees under the contingency fee contract....") (citations omitted).

Moreover, Florida Bar Rule 4–1.5(f)(4)(B)(i), while not binding on the Court's determination, provides guidance on the issue. Rule 5–1.4(f)(4)(B)(i) lists standards for contingency fees, and states that contingency fees in excess of the standards are presumptively clearly excessive. Thus, a contingency fee within the established standards is not presumptively excessive, and the party claiming it is excessive assumes the burden of demonstrating that it is.

The relevant Rule 4–1.5(f)(4)(B)(i) standard at play here states that an attorney may recover 40% of any recovery up to $1 million if recovery is had after the fling of an answer. Since Acosta's contingency rate is 30%, and Eakin is recovering $600,000, Acosta's attorney's fees are not clearly excessive. With Eakin offering nothing more than conclusory statements that the fee is excessive, this Court cannot say that Acosta's fees are excessive or unconscionable. As Acosta pointed out in his brief, he and Papadakis secured the $600,000 settlement offer after eleven years of prior litigation and the efforts of five or six previous law firms failed to produce anything of value for Eakin.

Based on the communications Eakin himself has had with this Court, it appears that he is an intelligent man with an intense interest in his case. In this case alone, Eakin has, no doubt, acquired a substantial knowledge on how to retain and terminate counsel. Eakin was free to accept or reject the use of a contingency fee contract and the terms of the executed contingency fee contract. Eakin must have known that Acosta was going to represent him in settlement negotiations. Eakin must have expected, or at least hoped, that Acosta would obtain a favorable recovery for him. Having represented Eakin and obtained a favorable recovery for him, Acosta is now entitled to his fee in accordance with the contingency fee contract.

### E. *ACOSTA'S DEMAND FOR ATTORNEY'S FEES IS RIPE*

Eakin claims that the determination of Acosta's attorney's fees is not ripe for adjudication because INA's final lien amount has not been fixed. Since the Court finds that Acosta's fees are calculated without regard to INA's lien, Eakin's claim is meritless. As discussed above, everything that is required to calculate Acosta's fees is properly before the Court.

### IV.

### *CALCULATION OF INA'S CONTRIBUTION TOWARDS EAKIN'S ATTORNEY'S FEES*

The Court postponed the computation of INA's proportionate share of Eakin's attorney's fees because the exact amount of Acosta's fees had yet to be determined. Having

determined that Acosta is entitled to $178,948.93 in attorney's fees, the Court is now ready to calculate INA's proportionate share in accordance with the *Moody* formula.

*Moody* provides for the apportionment of "the necessary and reasonable costs of recovery" between the worker and the employer according to their interests in the recovery. *Moody v. Arabie*, 498 So.2d 1081, 1086 (La. 1986). This Court will first calculate INA's interest in the recovery, and then it will determine what are the necessary and reasonable costs to be apportioned.

## A. *INA'S INTEREST IN THE RECOVERY*

According to *Moody*, 498 So.2d at 1086, the Intervenor's interest in the recovery is calculated as follows:

$$\frac{\text{Intervenor's Recovery}}{\text{Total Recovery From Third Party}} = \text{Intervenor's interest}$$

Plugging in the appropriate numbers, INA's interest is:

$$\frac{\$226,197.68}{\$600,000.00} = 37.7\%$$

## B. *THE NECESSARY AND REASONABLE COSTS TO BE APPORTIONED*

The Court must next determine the amount of necessary and reasonable costs incurred by Eakin. Here, Eakin has managed to retain and terminate several attorneys over the course of this litigation, and as a result, he has incurred legal fees and costs with numerous attorneys.[11] However, not every dollar paid to a lawyer qualifies as a necessary and reasonable cost to be apportioned between worker and insurer. First, "[t]he attorney's fee to be apportioned must be assessed by the standards of the Code of Professional Responsibility ... which prohibits a lawyer from collecting an unreasonable fee." *Norris v. Goeders*, 652 So.2d 144, 147 (La.App. 2nd Cir.1995) (citing *Moody*, 498 So.2d at 1086). Moreover, "[i]n determining a reasonable attorney's fee, the court is not bound by or limited to the contingent fee contract or the precise amount actually charged." *Id.* "Finally, to qualify as a reasonable and necessary cost of recovery, ... the fee must relate to necessary services which actually benefitted or augmented recovery from the third person; rather than duplicative services or those designed to benefit a single party." *Id.* (citing *Moody*, 498 So.2d at 1086).

The Court finds that Eakin cannot have INA assume a proportionate share his total legal expense. The problem here is that Eakin's litigation efforts have proceeded along two separate and distinct paths. On the one hand, Eakin filed and prosecuted a suit against Defendant Sikorsky which ultimately led to the settlement. But on the other hand, Eakin has expended a great deal of effort challenging INA's entitlement to a worker's compensation lien, as well as the amount of such a lien. To remain faithful to Louisiana's directive of allocating only those fees which "actually benefitted or augmented recovery" from Defendant Sikorsky, the Court finds that only those fees allocable towards the former efforts—Eakin's suit against Sikorsky—can be apportioned between Eakin and INA since those are the only efforts which could have benefitted INA.

The latter litigation efforts—Eakin's challenge against INA—certainly did not benefit INA, nor did they augment the recovery from Sikorsky. Such efforts were antagonistic towards INA's interests and have held-up the distribution of the settlement proceeds. As such, INA cannot be expected to assume a proportionate share of those fees.

Thus, this Court must determine what portion of Eakin's attorney's fees is attributable

11. For example, Eakin now owes $178,948.93 to Acosta and $35,000.00 to Speiser, Krause. Moreover, it seems as if Eakin either has paid or owes something to former counsel Mendelson and Cecile Hatfield. Finally, Eakin's new attorney, Ron Sprague, will undoubtedly be entitled to fees as well.

to Eakin's prosecution and settlement of his claim against Defendant Sikorsky.[12] Although a precise calculation would require each and every attorney who worked on this case to allocate his or her time and costs between the two efforts, the Court finds that such an exact allocation is not required. As stated *supra*, "the court is not bound by or limited to the contingent fee contract or the precise amount actually charged." *Norris v. Goeders*, 652 So.2d 144, 147 (La.App. 2nd Cir.1995) (citing *Moody*, 498 So.2d at 1086). After careful deliberation, the Court finds that Acosta's 30% contingency fee is an accurate measure of the necessary and reasonable attorney's fees required to prosecute and settle Eakin's claim against Sikorsky.

The Court recognizes that a determination that only $178,948.93 of Eakin's total fees are to be allocated is somewhat superficial. There is little question that a portion of Acosta's efforts were geared towards challenging INA's right to a lien and should be excluded, But at the same time, the legal fees Eakin incurred in the early stages of this litigation were devoted towards the successful prosecution of Eakin's claim against Sikorsky and should be included. It is unrealistic to think that a precise allocation based on hours spent by Eakin's attorneys over a decade ago would be any less superficial.

Moreover, the Court finds that the 30% rate approximates, for practical purposes, the "standard" contingency rate charged by attorneys in personal injury cases. It is reasonable to assume that had Eakin retained the services of just one attorney, that lawyer would have rendered his or her services at a 30% contingency rate. Finally, because Eakin chose to retain and terminate the services of multiple attorneys, he must be the one who bears the "duplicative" fees, not INA.

Applying the *Moody* formula, the Court calculates INA's share of Eakin's attorneys fees and costs as follows:

Attorney's Fees:

|  |  |
|---|---|
| Eakin's allocable attorney's fees | $ 178,948.93 |
| INA's interest in the recovery | ✕ 37.7% |
| **INA's share of Eakin's attorney's fees** | **$ 67,465.75** |

Costs:

|  |  |
|---|---|
| Eakin's allocable costs | $ 3,503.57 |
| INA's interest in the recovery | ✕ 37.7% |
| **INA's share of Eakin's costs** | **$ 1,320.85** |

### C. INA IS NOT ENTITLED TO A CREDIT FOR ITS ATTORNEY'S FEES

██ Under Louisiana law, an intervenor may be entitled to a credit for its own attorney's fees where the intervenor's attorney's services "actually benefitted or augmented recovery from the third person, rather than duplicative services or those designed to benefit a single party such as the mere monitoring of proceedings." *See, e.g., Taylor v. Production Services Inc.*, 600 So.2d 63, 67 (La. 1992) (citing *Moody*, 498 So.2d at 1086–87). However, INA has not claimed a credit for its attorney's fees, and the record does not support such a claim. There is nothing in the record to indicate that the services provided by INA's attorneys "actually benefitted or augmented recovery" from Sikorsky. It appears as if INA's role in this litigation was limited to defending its entitlement to a lien. If INA takes exception to the Court's finding, it is free to file a motion for reconsideration.

### V.

### INTERVENOR'S MOTION TO TAX COSTS AND FOR ENTRY OF FINAL JUDGMENT

Looking first INA's Motion for Entry of Final Judgment, the Court finds that since it

---

**12.** For simplicity, the Court will refer only to attorney's fees. However, the analysis applies to the costs as well.

has reconsidered its earlier decision, see supra, the Motion must be DENIED.

INA also moves this Court to tax $1,593.94 in costs associated with its expert witness testimony: $953.95 for Michael J. Kincade and $639.99 for Charles Thomas. After reviewing the supporting documentation, the Court GRANTS INA's Motion to the extent of $1,490 .00, as the untaxed portion represents unnecessary expenses.

## VI.

### *DISTRIBUTION OF THE $600,000 SETTLEMENT PROCEEDS*

Based on the foregoing, the Court hereby ORDERS Defendant Sikorsky to distribute the $600,000 settlement proceeds as follows:

| | | |
|---|---:|---:|
| INA's worker's compensation lien | | $226,197.68 |
| INA's taxable costs | | 1,490.00 |
| Less: INA's share of Eakin's attorneys fees | $67,463.75 | |
|      INA's share of Eakin's costs | 1,320.85 | |
| | (68,784.60) | |
| **AMOUNT DUE TO INA** | | **$158,903.08** |
| Acosta's and Papadakis' fees | 178,948.93 | |
| Acosta's and Papadakis' costs | 3,503.57 | |
| **AMOUNT DUE TO ACOSTA AND PAPADAKIS** | | **182,452.50** |
| **AMOUNT DUE TO SPEISER, KRAUSE** | | **35,000.00** |
| **AMOUNT DUE TO EAKIN** | | **223,644.42** |
| **TOTAL DISTRIBUTION FROM SIKORSKY** | | **$600,000.00** |

### *CONCLUSION*

The Court having considered the matter and being otherwise fully advised in the premises, it is hereby.

ORDERED AND ADJUDGED that:

Eakin's Motion for Partial Reconsideration is GRANTED.

Acosta and Papadakis' Motion to Enforce Charging Lien is GRANTED.

INA's Motion to Tax Costs is GRANTED to the extent of $1,490.00 in claimed costs.

INA's Motion for Final Judgment is DENIED.

All other pending motions are deemed MOOT and, therefore, DENIED.

In view of the foregoing dispositions, this case is now dismissed, with prejudice. The Court will retain jurisdiction of this matter for ninety (90) days, during which time the parties will be expected to consummate the settlement with the necessary exchange of papers and payments. Any of the parties may apply to the Court for appropriate relief in the event of noncompliance with the agreement or this Court's Order. A final order has been entered so that any party aggrieved by this disposition may take an appeal.